998 F.2d 1247
 37 Fed. R. Evid. Serv. 360
 UNITED STATES of America, Plaintiff-Appellee,
v.
Keith Gordon HAM, a/k/a Number One, a/k/a K Swami, a/k/a
Kirtanananda, a/k/a Srila Bhaktipada, a/k/a/
Kirtanananda Swami Bhaktipada,
Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Steven FITZPATRICK, a/k/a Sundarakara, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Terry SHELDON, a/k/a Mr. Scam, a/k/a Tapahpunja, Defendant-Appellant.
 Nos. 91-5350, 91-5430 and 91-5870.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 18, 1992.
Decided July 1, 1993.
Amended by Order Filed July 21, 1993.
 
 Alan M. Dershowitz, Cambridge, MA, argued (Nathan Z. Dershowitz, Victoria B. Eiger, Amy Adelson, Dershowitz & Eiger, P.C., New York City, on brief), for defendant-appellant Ham.
 Greta Conway Van Susteren, Coale, Allen & Van Susteren, Washington, DC, argued (Claudia Callaway, on brief), for defendant-appellant Sheldon.
 Richard Allan Dezio, Alexandria, VA, argued, for defendant-appellant Fitzpatrick.
 Michael D. Stein, Asst. U.S. Atty., Wheeling, WV, argued (William A. Kolibash, U.S. Atty., Wheeling WV, Nina Goodman, U.S. Dept. of Justice, Washington, DC, on brief), for plaintiff-appellee.
 Before RUSSELL, WIDENER, and HALL, Circuit Judges.
 OPINION
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 Appellants Keith Gordon Ham, Steven Fitzpatrick and Terry Sheldon were convicted below for RICO and mail fraud violations. The three are members of the Hare Krishna religion and allegedly engaged in criminal activity in order to promote and preserve the New Vrindaban Krishna community in which they lived. On appeal, Appellants contend inter alia that the evidence was not sufficient to support the jury verdict and that evidence admitted at trial of homosexuality, child molestation and abuse, and subordination of women within the community unduly prejudiced the jury. We agree that certain evidence admitted at trial was unduly prejudicial and vacate the convictions of Ham and Sheldon. We reverse the conviction of Fitzpatrick because the evidence against him was insufficient.
 
 I.
 
 2
 We briefly summarize the facts relevant to our disposition of this appeal. In 1968 Ham founded, along with Howard Wheeler, a Hare Krishna community in West Virginia called New Vrindaban. Ham changed his name to Kirtanananda Swami (hereinafter referred to as Swami) and became the ruler of the community. Members of the community testified that Swami had control over all aspects of community life, including financial decisions. Over the years the community increased its membership such that in the 1980's it counted over 500 devotees, owned more than 3,000 acres of land and brought in approximate profits from charitable solicitations of $10 to $12 million during a five year period.
 
 
 3
 New Vrindaban received most of its support from contributions solicited by its members. In the Krishna religion, soliciting donations, or "sankirtan," is a ritual. Traditionally, devotees distributed religious publications and then solicited donations. However, due to public disapprobation of the religion, in 1973 devotees of New Vrindaban began dressing in street clothes and distributing bumper stickers or other non-religious items. Many of these items contained counterfeit copyrighted images, such as popular cartoon characters or sports team logos. Devotees would also sometimes wear false identification tags indicating that they were soliciting on behalf of a particular charity.
 
 
 4
 Appellant Sheldon, along with Dennis Gorrick, directed the sankirtan efforts of the New Vrindaban community from 1973 until around 1977 or 1978. Sheldon was credited with the ideas of selling counterfeit bumper stickers and wearing false identification tags. Sheldon then left New Vrindaban to become president of a Krishna temple in Cleveland, Ohio, and Gorrick took charge of sankirtan at New Vrindaban. Gorrick occasionally mailed fund-raising materials to devotees remaining on the road and also received sankirtan money from them by mail. Swami apparently acted as general manager of sankirtan, encouraging (and allegedly coercing) devotees to bring in money and then accounting for the profits as reported to him by Gorrick.
 
 
 5
 New Vrindaban owned a print shop in which it printed bumper stickers and other items used in sankirtan. Appellant Fitzpatrick supervised the print shop from 1981 through 1986. Although Fitzpatrick did not decide what was to be printed, he did supervise all job orders from Gorrick. During Fitzpatrick's tenure, the shop printed counterfeit bumper stickers containing copyrighted images. The shop also printed false identification tags used by the devotees in solicitations. Arthur Villa, president of New Vrindaban, and Howard Fawley, comptroller, warned Swami of the illegality of selling counterfeit copyrighted paraphernalia at several board meetings. Although there was evidence that Fitzpatrick occasionally attended board meetings, no evidence linked him to the particular meetings at which the counterfeit goods were discussed.
 
 
 6
 Several other incidents concerning members or former members of the New Vrindaban community are related to this case. First, in 1979, Swami concealed a nine year old boy named Devin Wheeler from the County Sheriff when the Sheriff attempted to take custody of the boy under a court order. Devin's mother had left the New Vrindaban community and, fearing sexual abuse of the child, obtained a court order to have the child temporarily removed from the community to undergo a medical examination. Devin's father, who still lived in the community, had permanent custody.
 
 
 7
 Next, in the early 1980's, community comptroller Howard Fawley devised a scheme to obtain lower insurance rates on the community's vehicles. Due to a high accident rate, community vehicles could only be insured through Lloyd's of London at very high premiums. Fawley arranged to transfer apparent ownership of the vehicles from the community to individual devotees and then insure the vehicles under less expensive personal policies. The devotees did not actually own the vehicles; the vehicles remained under the control of the community pursuant to a power of attorney executed by each devotee.
 
 
 8
 The next incident involved the murder of devotee and community member Charles St. Denis on June 10, 1983. When community member Daniel Reid learned that St. Denis had raped Reid's wife, Reid decided to kill St. Denis. Before attempting to murder St. Denis, Reid consulted Swami. Swami instructed Reid that the killing was acceptable under Krishna scriptures, but that such action violated secular laws and that Reid might be caught and punished. Swami then directed Reid to talk to Thomas A. Drescher, a fellow devotee. When Reid approached Drescher and told him what Swami had said, Drescher testified he felt duty bound to help Reid kill St. Denis. The two then enticed St. Denis to Reid's house one night, shot and stabbed him several times, and then buried him in a pre-dug grave before he was dead.[1]
 
 
 9
 The last incident likewise involved the murder of a devotee. In 1985, Steven Bryant, a former New Vrindaban devotee, began publishing statements accusing Swami of engaging in homosexual activity and permitting sexual molestation of children in the community. Around April of 1986, members of the Krishna community in Los Angeles notified Drescher that Bryant was in Los Angeles. Drescher received $2,500 from the New Vrindaban community, authorized by Swami, and flew to Los Angeles. He located Bryant and shot him twice in the head. Drescher immediately returned to Columbus, Ohio. Sheldon then picked up $6,000 for Drescher from Swami, and Sheldon and Drescher made plans to leave the country. Both were arrested before they could leave, but police later released Sheldon.[2] Sheldon then left the country for Ireland where he joined a Krishna temple under a false name. There he confessed to temple president Peter Brinkman that he had engineered the Bryant murder.
 
 
 10
 In May 1990 a federal grand jury handed down an eleven count indictment against Swami, Sheldon and Fitzpatrick.[3] The indictment charged Swami and Sheldon with conspiracy to violate RICO and a substantive RICO violation based on the predicate acts described above (Counts I, II and III). It further charged Swami and Sheldon with conspiracy to murder Bryant for money in violation of 18 U.S.C. § 371 (Count IV). Swami, Sheldon and Fitzpatrick were charged with conspiracy to commit mail fraud and substantive mail fraud in connection with the sankirtan (Counts VI and VII). Finally, Swami was charged with conspiracy to commit mail fraud and substantive mail fraud in connection with the automobile insurance scheme (Counts VIII-XI).
 
 
 11
 At the end of a several day trial, the jury convicted Appellants of the following Counts:
 
 
 12
 SWAMI: Count I (conspiracy to violate RICO); Count II (engaging in pattern of racketeering activity); Count III (investing racketeering proceeds in an enterprise); Count VI (conspiracy to commit mail fraud by trafficking in counterfeit goods and infringing copyrights); Count VII (mail fraud--charity scheme); Count VIII (conspiracy to commit mail fraud--insurance); Counts IX-XI (mail fraud--insurance).
 
 
 13
 SHELDON: Count I (conspiracy to violate RICO); Count IV (conspiracy to murder Bryant); Count VI (conspiracy to commit mail fraud by trafficking in counterfeit goods and infringing copyrights).
 
 
 14
 FITZPATRICK: Count VI (conspiracy to commit mail fraud by trafficking in counterfeit goods and infringing copyrights).
 
 
 15
 The court sentenced Appellants under the guidelines.
 
 
 16
 Swami, Sheldon and Fitzpatrick now appeal their convictions on numerous grounds. Swami and Fitzpatrick also appeal their sentences. Because we vacate or reverse the convictions in this case, we need not decide all the issues raised by Appellants,[4] and specifically do not decide any of the sentencing issues.
 
 II.
 
 17
 Both Swami and Sheldon challenge the admission of inflammatory, prejudicial evidence that they contend was improperly admitted under Fed.R.Evid. 404(b) and, moreover, should have been excluded as prejudicial under Fed.R.Evid. 403. They raise several incidents in this regard. We agree with Appellants that this evidence was unduly prejudicial and warrants a new trial. Therefore, we discuss only Appellants' Rule 403 challenge, assuming arguendo that the evidence was admissible under Rule 404(b).
 
 
 18
 Ham and Sheldon first challenge the admission of evidence of child molestation and homosexual conduct. Several witnesses testified over two days that principals, teachers and monitors in the community's school had sexually molested some of the children. They testified that Swami was aware of the incidents, but ignored the problem. Two other witnesses mentioned that Swami had a homosexual relationship with Howard Wheeler prior to starting the New Vrindaban community. The government offered this evidence to show Swami's motive in the Steven Bryant murder, which it contended was to silence Bryant's accusations of child molestation and homosexuality. The government reasoned that by proving these accusations true through witness testimony, it showed that Bryant was truly a threat to Swami and not just an annoyance that Swami could ignore.
 
 
 19
 Swami and Sheldon also challenge the district court's admission of a videotape segment from the television program West 57th Street (a "news" expose program). The videotape showed a child of the New Vrindaban community stating that he prayed "to" Swami, a statement generally offensive to the religious sensitivities of typical jurors. More inflammatory was a statement by Swami comparing women to dogs and condoning lightly slapping one's wife for disciplinary reasons. The government introduced this tape as a prior inconsistent statement to impeach Swami's trial testimony concerning the community's treatment of women.[5]
 
 
 20
 Our review of a district court's evidentiary rulings is for abuse of discretion. In a criminal appeal, we will not vacate a conviction unless we find that the district court judge acted arbitrarily or irrationally. United States v. Simpson, 910 F.2d 154, 157 (4th Cir.1990); United States v. Masters, 622 F.2d 83, 88 (4th Cir.1980). "[W]e are reluctant to question a trial court's judgment under Rule 403, and for good reason. 'Trial judges are much closer to the pulse of a trial than ... [we] can ever be....' " Simpson, 910 F.2d at 157 (quoting United States v. Tindle, 808 F.2d 319, 327 n. 6 (4th Cir.1986)). Nevertheless, we will not hesitate to reverse on the basis of a trial court's admission of evidence where it appears that the evidence should have been excluded under the Federal Rules of Evidence and that such admission prejudiced a defendant's trial.
 
 
 21
 Rule 403 provides that evidence otherwise admissible may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. The rule calls for weighing the need for admission against the potential harms. When the harmful component of relevant evidence becomes unduly prejudicial, a court should exclude it from consideration by the jury. We have defined undue prejudice as " 'a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.' " Masters, 622 F.2d at 87 (citations omitted); accord Simpson, 910 F.2d at 158; Mullen v. Princess Anne Volunteer Fire Co., Inc., 853 F.2d 1130, 1134 (4th Cir.1988).
 
 
 22
 We accept without need of extensive argument that implications of child molestation, homosexuality,[6] and abuse of women unfairly prejudice a defendant. Indeed, no evidence could be more inflammatory or more prejudicial than allegations of child molestation. When evidence of a defendant's involvement in several of these activities is presented to the jury, the risk of unfair prejudice is compounded. In such a case, we fear that jurors will convict a defendant based on the jurors' disdain or their belief that the defendant's prior bad acts make guilt more likely. Furthermore, we are especially sensitive to prejudice in a trial where defendants are members of an unpopular religion.
 
 
 23
 Even though Swami and Sheldon were not directly implicated in all the conduct presented at trial, we still find it prejudicial to them as defendants. The jury heard testimony of child molestation seemingly rampant in the New Vrindaban community, a community over which Swami had complete authority and responsibility. Several witnesses also stated that Swami knew of the activity. They alleged that they had approached Swami with their concerns of child molestation, but he failed to take any action and simply shrugged off the complaints. This evidence was especially prejudicial in connection with the Devin Wheeler kidnapping charge, where the government proffered that Swami kidnapped the boy because he had been molesting him.
 
 
 24
 Sheldon, like Swami, was a leader in the Hare Krishna religion. He had been a director of sankirtan in the New Vrindaban community and left to become president of a Krishna temple in Cleveland, Ohio. After his departure, he remained in contact with Swami and others at New Vrindaban. Thus, any evidence that prejudiced New Vrindaban and the Hare Krishna religion would likewise prejudice Sheldon as a leader in that community and religion. We find that especially likely here, where the evidence is highly inflammatory.
 
 
 25
 Our inquiry does not end here. We must weigh the probative value of the evidence against the danger of harm and determine if the district court could have, within its discretion, permitted the introduction of such evidence before the jury. Evidence of child molestation and homosexuality were brought in for the limited purpose of proving Steven Bryant's accusations. This was relevant to the government's theory of motive for the Bryant murder. It is not, however, direct proof of motive; neither is it essential proof. If believed by the jury, it would only make the motive slightly more likely. The jury could still have inferred, without this evidence, that Swami ordered Bryant shot in order to stop the negative publicity. Thus, the incremental probative value of this evidence is slight. In the face of almost certain and considerable prejudice, we do not believe this evidence should have been admitted.
 
 
 26
 Likewise, the West 57th Street videotape was more prejudicial than probative. That tape was allegedly introduced to rebut Swami's trial testimony. The highly inflammatory statement concerning the treatment of women had no relevance except possibly as impeachment evidence. Yet the risk that the jury would consider the substance of this evidence, as opposed to its rebuttal value, was great. Again, this evidence should not have been admitted.
 
 
 27
 The district court expressed concern and even regret over these admissions. It issued a limiting instruction regarding the evidence of sexual conduct:
 
 
 28
 And let me remind you, and I think counsel have, there isn't any defendant on trial here for sexual acts.... It has all gotten--I don't know whether--whether those things are permitted, any evidence on it, and whether you accept them or not is entirely up to you, was only, as I understand the government's theory, to show motive for doing--allegedly doing certain things. (Joint App. Vol. I-A at 190.)
 
 
 29
 . . . . .
 
 
 30
 Bear in mind nobody is charged with sexual crimes. The sexual, alleged molestation is asserted in the indictment, but only in as [sic] an effort to show motive, not anything else. We are not here to make any moral judgments, we make legal judgments in courts. (Joint App. Vol. I-A at 194.)
 
 
 31
 The court also issued a curative instruction regarding the videotape:
 
 
 32
 [T]he contents of the videotape display, which I believe was the last day that we heard any evidence, that ... may not be considered as evidence. I want you to put it out of your mind. Except to the extent that the videotape may have contained statements made by the defendant Swami. And any such statements are to be considered only in the context of credibility as to whether what effect if any. Put the other stuff--I shouldn't have let it go in, but it got in, and I want you to put it out of your mind. Just forget all about it. (Tr. 2015-16.)
 
 
 33
 We recognize that prejudice "can be generally obviated by a cautionary or limiting instruction, particularly if the danger of prejudice is slight in view of the overwhelming evidence of guilt." United States v. Masters, 622 F.2d at 87. The danger of prejudice in this case, however, was not "slight", nor was the evidence of guilt overwhelming. Furthermore, we do not believe the cumulative effect of the several items of prejudicial evidence could be cured with limiting or cautionary instructions. See Virgin Islands v. Pinney, 967 F.2d 912, 918 (3d Cir.1992) (holding that limiting instruction on testimony of child molestation would not reduce risk of jury considering such evidence for improper purpose); United States v. Bland, 908 F.2d 471, 473 (9th Cir.1990) (holding that curative instruction could not obviate prejudice from evidence that defendant had outstanding warrant for molestation and torture and murder of a young girl).
 
 
 34
 Because we conclude that the district court abused its discretion in admitting this evidence and that this inflammatory evidence so infected the trial of Swami and Sheldon, we vacate their convictions on all counts and remand for retrial.
 
 III.
 
 35
 Fitzpatrick challenges the sufficiency of the evidence to support his mail fraud conspiracy conviction.[7] He contends that the evidence merely shows that he was a foreman of the community print shop, working according to Gorrick's instructions. He further contends that the evidence does not show that he had a specific intent to defraud, as is required for conviction for mail fraud conspiracy.
 
 
 36
 We review sufficiency of the evidence claims under the familiar standard of Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942): "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." To convict on mail fraud conspiracy, the jury must find that a defendant acted with specific intent to defraud. 18 U.S.C. § 1341 (1988); United States v. Scott, 730 F.2d 143, 147 (4th Cir.), cert. denied, 469 U.S. 1075, 105 S.Ct. 572, 83 L.Ed.2d 512 (1984). Fraudulent intent may be inferred from the totality of the circumstances and need not be proven by direct evidence. United States v. Saxton, 691 F.2d 712, 714 (5th Cir.1982); United States v. Rhoads, 617 F.2d 1313, 1316 (8th Cir.1980); United States v. Beecroft, 608 F.2d 753, 757 (9th Cir.1979).
 
 
 37
 The government did not present sufficient evidence in this case to permit a jury to find that Fitzpatrick conspired with others with an intent to defraud. Fitzpatrick appears nothing more than a religious devotee serving the New Vrindaban community as foreman of the print shop. He took orders from Dennis Gorrick, who exercised complete control over sankirtan activities. Gorrick decided on the design and quantity of bumper stickers printed at the shop. Fitzpatrick determined if the shop was capable of performing such jobs, ordered the supplies, and carried out the work. None of these activities evidence a specific intent to defraud.
 
 
 38
 Furthermore, it is not clear that Fitzpatrick even knew that his work violated copyright laws. The government supports its inference with evidence that the New Vrindaban print shop acquired a printing press when outside printers refused to print some of its copyrighted stickers; that Fitzpatrick oversaw the redrawing of copyrighted images; that Fitzpatrick learned that a devotee had been warned by an employee of the Charles Schultz company that the counterfeit Snoopy stickers violated copyright laws; and that Fitzpatrick sometimes attended community board meetings, where the illegality of distributing counterfeit material was occasionally discussed. None of this evidence specifically shows knowledge by Fitzpatrick. There is no evidence that he participated in the decision to buy a printing press; or that he was present for any of the board discussions. Fitzpatrick testified that Gorrick told him and others that the redrawn images were sufficiently altered so that they did not violate copyright laws. Because we can find no evidence to support the jury's finding that Fitzpatrick conspired to perpetrate mail fraud, we reverse Fitzpatrick's conviction.
 
 IV.
 
 39
 We find that the government's introduction of evidence of child molestation, homosexuality, and mistreatment of women was highly prejudicial to the Appellants. The risk of harm to Swami and Sheldon from this evidence substantially outweighed the probative value of the evidence. Thus, the evidence should have been excluded pursuant to Fed.R.Evid. 403. Accordingly, we vacate the convictions of Swami and Sheldon and remand for retrial. We further find that the government's evidence was insufficient to support Fitzpatrick's conviction for mail fraud conspiracy, and we reverse his conviction.
 
 
 40
 VACATED IN PART AND REMANDED FOR RETRIAL; REVERSED IN PART.
 
 
 41
 K.K. HALL, Circuit Judge, concurring in part and dissenting in part;
 
 
 42
 I concur in the reversal of Fitzpatrick's conviction for the reasons contained in Section IV of the majority opinion. However, I do not agree that the introduction of certain evidence warrants a new trial for Ham and Sheldon. Therefore, I respectfully dissent.*
 
 I.
 
 43
 The majority correctly outlines the government's theory advanced in support of introducing the evidence concerning child molestation and homosexuality--Bryant was publishing accusations that Ham had engaged in homosexual activity and had permitted child molestation in the New Vrindabin community, and Ham decided to have him murdered to silence him. The government hoped to show that Bryant's accusations had a basis in fact and, as such, constituted a real threat to Ham.
 
 
 44
 The majority assumes arguendo that this evidence was admissible under Fed.R.Evid. 404(b) to prove motive. The decision to vacate the convictions is grounded in Rule 403: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." (emphasis added). The majority "accept[s] without need of extensive argument that implications of child molestation, homosexuality, and abuse of women unfairly prejudice a defendant. Indeed, no evidence could be more inflammatory or more prejudicial than allegations of child molestation." Op. at 1252. I agree that such evidence prejudices defendants. My disagreement with the majority boils down to a differing view of the relative weights of the probative value and prejudicial effect of the evidence.
 
 
 45
 If Bryant were merely making wild allegations characteristic of a disgruntled former group member, I believe that a jury would be unlikely to infer a motive to murder from the allegations. If the allegations were true, however, a motive to silence the accuser becomes appreciably stronger, and not, as the majority states, merely "slightly more likely." Op. at 1253. A lone, cranky voice is merely an annoyance. When the voice has the ring of truth, however, it becomes a threat. Inasmuch as "we must look at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect," I would assign a great deal more weight to the probative value side of the Rule 403 balance beam. United States v. Simpson, 910 F.2d 154, 157 (4th Cir.1990) (internal quotation omitted).
 
 
 46
 In the context of Rule 403 rulings, appellate courts have been particularly deferential to the lower courts. "It has been said that ... undue prejudice would seem to require exclusion [under Rule 403] only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." United States v. Masters, 622 F.2d 83, 87 (4th Cir.1980) (internal quotation omitted). As the majority notes, a reversal of a conviction on the basis of improperly admitted evidence must be based on a finding that the trial judge acted "arbitrarily or irrationally." Op. at 1252 (quoting United States v. Simpson, 910 F.2d at 157). When the district court's cautionary instructions are factored into the analysis, the case for overturning the convictions is weakened even further. See Masters, 622 F.2d at 87-88 ("Such prejudice, if any, can generally be obviated by a cautionary or limiting instruction....").
 
 
 47
 The admission of the West 57th Street tape, on which Ham compared women to dogs and advocated mild physical discipline of wives by their husbands, presents a somewhat closer case. Ham's statements were relevant for impeachment purposes. After the tape had been viewed by the jury, the trial court had second thoughts about its introduction and instructed the jury to consider only the statements made by Ham for the purposes of assessing his credibility. With regard to the remainder of the tape, the court told the jury "to put it out of your mind. Just forget all about it." I do not take issue with the majority's statement that the tape was "more prejudicial than probative." Again, however, the question is whether the trial court acted "arbitrarily or irrationally" in admitting this piece of evidence. I do not believe the lower court's decision can be so characterized.
 
 
 48
 Only the "most extraordinary of circumstances" justify overturning a conviction on the basis of improperly admitted evidence. United States v. Heyward, 729 F.2d 297, 301 n. 2 (4th Cir.1984) (internal citation omitted), cert. denied, 469 U.S. 1105, 105 S.Ct. 776, 83 L.Ed.2d 772 (1985). The mixed verdict--Ham was found not guilty of Count IV, conspiracy to murder Bryant--indicates that the jury was not "excited to irrational behavior" in its deliberations. Masters, 622 F.2d at 87; see, also, United States v. Richman, 600 F.2d 286, 299-300 (1st Cir.1979) (mixed verdict "demonstrates the jury's ability to segregate the evidence and carefully weigh against which defendant it was applicable").
 
 II.
 
 49
 Sheldon left New Vrindaban in 1977 or 1978 to become president of a Krishna temple in Ohio. Although he was not implicated in child molestation or homosexuality and was not the subject of the West 57th Street tape, the majority concludes that "[a]ny evidence that prejudiced New Vrindaban and the Hare Krishna religion would likewise prejudice Sheldon as a leader in that community and religion." Op. at 1253. This represents an unprecedented extension of Rule 403. The connection between Sheldon and the purportedly prejudicial evidence is simply too attenuated for any appreciable prejudice to flow to him.
 
 
 50
 I would affirm the convictions and sentences of Ham and Sheldon.
 
 
 
 [1]
 Reid and Drescher were convicted for the St. Denis murder
 
 
 [2]
 Drescher was subsequently tried and convicted in West Virginia for the St. Denis murder and tried and convicted in California for the Bryant murder
 
 
 [3]
 Others involved in these incidents have been tried separately or granted immunity for their cooperation with the government
 
 
 [4]
 Our decision to vacate the convictions of Ham and Sheldon moot their other claims concerning erroneous or prejudicial trial rulings. It does not, however, moot their sufficiency of the evidence claims, since a decision for either of them on this issue would reverse rather than vacate the conviction. The government's evidence for many of the RICO predicate acts was not overwhelming in this case--for example the evidence concerning Swami's involvement in the St. Denis murder or the Devin Wheeler kidnapping and the evidence concerning Sheldon's participation in mail fraud
 
 
 [5]
 Swami contests the admissibility of this evidence. He contends that he never testified on direct or cross examination about the treatment of women in the community. The West 57th Street tape was introduced after he testified. He asserts that it was only after the tape was played that he testified about the position women occupied in the community. We do not make a ruling on the admissibility of the videotape as impeachment evidence since, in any event, we rule that the tape should not have been admitted under Rule 403
 
 
 [6]
 The Ninth Circuit recently stated in the context of an evidentiary appeal that "[e]vidence of homosexuality is extremely prejudicial." United States v. Gillespie, 852 F.2d 475, 479 (9th Cir.1988)
 
 
 [7]
 Some dispute exists as to what Count VI actually charged and, therefore, of what Fitzpatrick was convicted. We rely on the jury charge given by the district court and rule that Fitzpatrick was convicted of conspiracy to commit mail fraud. (See J.A. I-A at 224-26.) The district court's jury charge, although different from the indictment charge, did not constitute an impermissible constructive amendment of the indictment. See United States v. Morrow, 925 F.2d 779, 781 (4th Cir.1991)
 
 
 *
 The majority does not reach the other issues raised by Ham and Sheldon in their respective appeals. While I only discuss the evidentiary issues upon which the majority bases its judgment, I would not vacate or reverse the convictions on any of the other grounds raised by the defendants