53 F.3d 329
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Tyrone WEBB, Defendant-Appellant.
 No. 93-5601.
 United States Court of Appeals, Fourth Circuit.
 Argued: March 10, 1995.
Decided: May 1, 1995.
 
 Before MURNAGHAN, WILLIAMS, and MICHAEL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 On January 6, 1993, a federal grand jury in the United States District Court for the District of South Carolina returned a six-count indictment against Tyrone Webb ("Webb"), and his codefendant, LaFawn Ivery ("Ivery"). Webb and Ivery were charged in Count I of the indictment with conspiracy to distribute crack cocaine, in violation of 21 U.S.C. Sec. 846; in Count II with distributing crack cocaine on August 12, 1992, in violation of 21 U.S.C. Sec. 841(a)(1); and in Count III with distributing crack cocaine on August 18, 1992, in violation of 21 U.S.C. Sec. 841(a)(1). Count IV charged Ivery alone with possession with intent to distribute crack cocaine. Count V charged Webb with carrying a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. Sec. 924(c), and Count VI charged Webb with illegal possession of a firearm by a convicted felon in violation of 18 U.S.C. Secs. 922(g) and 924(e). Ivery pled guilty to one drug distribution count pursuant to a written plea agreement, and cooperated with the government in its case against Webb.
 
 
 2
 On July 16, 1993, a jury returned a guilty verdict against Webb on Counts I (conspiracy), III (crack distribution on August 18, 1992), V (carrying a firearm in relation to a drug trafficking offense), and VI (possession of a firearm by a convicted felon). The jury acquitted Webb on Count II (crack distribution on August 12, 1992). On December 19, 1993, Webb was sentenced to serve 327 months in prison on Counts I, III, and VI, followed by 60 months on Count V to run consecutively.
 
 
 3
 The questions presented here are as follows:
 
 
 4
 I. Did the district court abuse its discretion by admitting into evidence two beepers, a night stick, and handcuffs which were seized from Webb's car immediately following a drug transaction with an undercover agent?
 
 
 5
 II. Did the district court violate Webb's Fifth and Sixth Amendment rights by admitting into evidence testimony regarding Webb's statement made at a pre-trial bond hearing that he was self-employed in a landscaping and yard maintenance business?
 
 
 6
 III. Did the district court abuse its discretion in admitting into evidence testimony describing the lethal nature of the Black Talon hollow point bullets that were found loaded in the .40 caliber pistol which was seized by police from Webb's rental car?
 
 
 7
 IV. Did the district court err in denying Webb's motion to acquit on Count V of the indictment, which charged him with carrying a .40 caliber pistol "during and in relation" to a drug trafficking offense in violation of 18 U.S.C. Sec. 924?[1]
 
 Factual Background
 
 8
 On August 18, 1992, Stacey Drakeford, an undercover agent with the South Carolina Governor's Raid Team, a state drug task force, arranged with LaFawn Ivery, as part of an undercover drug operation, to purchase one ounce of crack cocaine. Agent Drakeford had previously discussed the purchase with Ivery on August 12, 1992, when he had purchased a quantity of crack cocaine from her and another individual identified as Appellant, Webb. Drakeford and the Governor's Raid Team had decided to arrest both Ivery and Webb, who was Ivery's alleged supplier, if the undercover purchase on August 18, 1992 was successful.
 
 
 9
 Members of the Raid Team kept surveillance on Drakeford during the undercover purchase on August 18. Additionally, Drakeford was outfitted with a body wire which was monitored by the Raid Team.
 
 
 10
 The undercover operation took place as follows. After telephoning Ivery, Drakeford drove to her house. Ivery then telephoned Webb, using Webb's beeper, and Webb agreed to come to Ivery's home to sell Drakeford one ounce of crack cocaine. Drakeford and Ivery waited for Webb in the front yard of Ivery's home. Sometime later, Webb drove into the yard alone, in a white Ford Topaz with Georgia license tags. Ivery got into Webb's car, and the two circled the neighborhood block, during which time Webb gave Ivery approximately one ounce of crack cocaine. Ivery took a portion of this ounce, and placed the remainder in a brown paper bag. Webb then returned to Ivery's home, at which time Ivery got out of the white car and gave Drakeford the brown bag containing the crack. Drakeford, after negotiating a price with Ivery, handed Ivery $1,300 in pre-recorded bills. Ivery and Webb drove away in Webb's car.
 
 
 11
 Drakeford notified the Raid Team that the undercover transaction had been successful, and the Raid Team accordingly converged upon the white car approximately two-tenths of a mile from Ivery's home. As the agents approached the car, Mitch Lominack, a member of the Raid Team, saw Webb's hand on top of a pistol in the glove compartment of the car. Lominack ordered Webb immediately to remove his hand from the glove compartment. Agent Mitchell Stephens also saw Webb with his hand on the pistol. Additionally, Ivery verified at trial that when she and Webb were approached by the agents, Webb had pulled the gun from the waistband of his pants and was putting it in the glove compartment of the car.
 
 
 12
 After Webb removed his hand from the glove compartment, Agent Lominack seized a .40 caliber Glock pistol from the compartment. The Glock was loaded with 16 rounds of "Black Talon" hollow point bullets. In addition, the agents found in the car a spare 13 round ammunition clip loaded with standard .40 caliber bullets. The agents also found two beepers, one of which was worn by Webb, a night stick, and handcuffs. The $1,300 in pre-recorded cash was found scattered on the front seat and floorboard of the car. Moreover, agents found an additional $1,455 in cash in an envelope in the glove compartment. Webb also had $1,002 in cash in his own pockets.
 
 
 13
 During the investigation that followed, it was discovered that the white Topaz had been leased by Webb in Atlanta, Georgia. A rental agreement executed by Webb was found in the glove compartment of the car and was introduced into evidence at trial, without objection. Additionally, a sales agent with the rental company testified at trial that Webb rented the white Topaz on the date of his arrest.
 
 
 14
 On January 6, 1993, a federal grand jury in the United States District Court for the District of South Carolina returned the six-count indictment against Webb and Ivery. At trial, the Government introduced into evidence the .40 caliber pistol, the 16 rounds of Black Talon hollow point bullets found loaded in the pistol, and the 13 "spare" rounds of standard bullets also found in the rented car. In addition, the district court determined that the two beepers, handcuffs, and night stick that were found in the car were relevant, and accordingly admitted them into evidence, over Webb's objection. In support of the court's finding that these items were relevant, Drakeford testified that he has frequently observed persons carrying guns and wearing beepers in drug transactions in which he has participated. Additionally, Agent Stephens testified, in response to a specific question on cross-examination, that he too has observed drug dealers with handcuffs and night sticks during previous drug arrests.
 
 
 15
 Also at trial, Agent Ralph Henry, of the Bureau of Alcohol Tobacco and Firearms ("ATF"), testified before the jury about the difference between the Black Talon hollow point bullets found loaded in the Glock pistol which Webb had in his hand, and the standard bullets which were located in another ammunition clip found in the car. Henry explained that the Black Talon bullet's hollowed lead core is surrounded by a black metal jacket, and that when fired, the metal jacket spreads out like an eagle's talon, thus the name Black Talon. Henry also explained that the Black Talon bullets cost twice as much as the standard .40 caliber bullets, and therefore would not normally be used for target practice. Henry was additionally permitted to testify that Webb, at a pre-trial bond hearing, had claimed to be selfemployed in a landscaping and yard maintenance business at the time of his arrest. That testimony was offered as evidence that the approxi mately $3,750 in cash, the gun, ammunition, night stick, beepers, and handcuffs were not related to Webb's employment.
 
 
 16
 On July 16, 1993, after a four-day trial, a jury returned a guilty verdict against Webb on Counts I, III, V, and VI. Webb was acquitted on Count II. On July 23, 1993, Webb filed a timely notice of appeal.
 
 
 17
 I. Admission of Beepers, Night Stick, and Handcuffs Into
 
 Evidence
 
 18
 Webb first contends that the district court abused its discretion in admitting into evidence the two beepers, handcuffs, and night stick seized from Webb's car immediately following his drug transaction with Drakeford. In particular, Webb argues that (1) those items were not relevant to the crimes charged, and thus were inadmissible, and (2) alternatively, that even if relevant, the evidence's probative value was outweighed by the danger of undue prejudice and so should have been excluded. In so arguing, Webb places special emphasis on his contention that there was no evidence that the items actually belonged to him, and thus served only to inflame the jury's prejudice against him. Webb's argument is unavailing under the law of this Court.
 
 
 19
 Rule 401 of the Federal Rules of Evidence ("FRE") defines "relevant" evidence as
 
 
 20
 evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
 
 
 21
 FRE 401 (emphasis added). Moreover, Rule 402 provides that all relevant evidence is admissible, except as provided by the Constitution, any statute of Congress, or by any of the other Rules of Evidence. FRE 402. In particular, the Rules provide that
 
 
 22
 [a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....
 
 
 23
 FRE 403 (emphasis added).
 
 
 24
 In United States v. Morison, 844 F.2d 1057 (4th Cir.1988), cert. denied, 488 U.S. 908 (1988), we held that in reviewing a challenge to the evidentiary rulings of a district judge, an appellate court must afford great deference to the trial judge's decision to admit or exclude evidence. In particular, it was held:
 
 
 25
 In passing on such exceptions it must be borne in mind that "the appraisal of the probative and prejudicial value of evidence under Rule 403 is entrusted to the sound discretion of the trial judge; absent extraordinary circumstances, the Court of Appeals will not intervene in its resolution. "
 
 
 26
 844 F.2d at 1078, quoting United States v. MacDonald, 688 F.2d 224, 227-28 (4th Cir.1982). Our review of a district court's evidentiary rulings is for abuse of discretion; indeed, in a criminal appeal, we will not vacate a conviction unless we find that the district judge acted "arbitrarily or irrationally." United States v. Ham, 998 F.2d 1247, 1252 (4th Cir.1993). Moreover, we have held that any error in admission or exclusion of evidence is subject to the harmless error test; that is, a conviction will be overturned on the basis of an improper evidentiary ruling only if "it is probable that the error could have affected the verdict reached by the particular jury in the particular circumstances of the trial." Morison, 844 F.2d at 1078, quoting United States v. Davis, 657 F.2d 637, 640 (4th Cir.1981). Thus, even if a trial court does abuse its discretion in admitting certain evidence, such admission will not amount to reversible error if the error did not probably affect the verdict reached.
 
 
 27
 Moreover, we have held that the standard for finding that relevant evidence is so unfairly prejudicial as to warrant exclusion is generally very difficult to meet. In United States v. Ham, 998 F.2d 1247 (4th Cir.1993), for example, we found that the government's introduction of evidence of child molestation, homosexuality, and abuse of women, was unfairly prejudicial to the leader of a religious community in his prosecution for racketeering, mail fraud, and murder. 998 F.2d at 1252. In so finding, however, we articulated a very difficult standard for finding such "undue prejudice"; in particular, we held:
 
 
 28
 We have defined undue prejudice as " 'a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.' " We accept without need of extensive argument that implications of child molestation, homosexuality, and abuse of women unfairly prejudice a defendant. Indeed, no evidence could be more inflammatory or more prejudicial than allegations of child molestation. When evidence of a defendant's involvement in several of these activities is presented to the jury, the risk of unfair prejudice is compounded. In such a case, we fear that jurors will convict a defendant based on the jurors' disdain or their belief that the defendant's prior bad acts make guilt more likely. Furthermore, we are especially sensitive to prejudice in a trial where defendants are members of an unpopular religion.
 
 
 29
 Id. at 1252-53 (emphasis added). In so holding, we placed special reliance on the fact that because none of the prejudicial evidence of child molestation bore directly on the government's theory of prosecution for murder, it should not have been admitted into evidence by the district court because the incremental probative value of the evidence was slight. Id. at 1253.
 
 
 30
 Under the standard articulated in the Federal Rules of Evidence and the case law of the Fourth Circuit governing the admissibility of evidence, it is apparent that the district court did not abuse its discretion in the instant case for two reasons: (1) the items introduced into evidence were relevant to the crimes charged, and (2) the probative value of the evidence was not "substantially outweighed by the danger of undue prejudice." FRE 403. Thus, the admission of such evidence did not amount to reversible error.
 
 
 31
 First, the items in question certainly were relevant to the crimes charged. The two beepers, for example, were relevant to Webb's involvement in a drug conspiracy, as charged in Count I of the indictment. Indeed, at trial, Drakeford testified that at the time of his arrest, Webb was wearing one of the beepers, and that the other beeper was in his car. Ivery also testified that she regularly paged Webb on his beeper whenever she needed to contact him to arrange for a sale of crack cocaine, and, specifically, that she used the beeper to arrange the August 18, 1992 drug transaction between Webb and Drakeford.
 
 
 32
 The district court's finding of relevance was further buttressed by Drakeford's testimony that in his experience, drug dealers generally use beepers in the drug trade. Indeed, other courts have expressly found that pagers and beepers are relevant in drug cases because such devices are frequently used by persons involved in trafficking. See, e.g., United States v. Jaramillo-Suarez, 950 F.2d 1378, 1385 (9th Cir.1991); United States v. Rogers, 918 F.2d 207, 212-13 (D.C.Cir.1990).
 
 
 33
 Likewise, the night stick and handcuffs were also relevant to the crimes charged, specifically to the charge that Webb used the .40 caliber pistol in relation to a drug trafficking offense in violation of 18 U.S.C. Sec. 924(c). Indeed, by introducing into evidence the night stick and handcuffs, the government sought to prove that Webb intended to use the pistol for protection of his cash and cocaine, in furtherance of his drug trafficking. Additionally, evidence that Webb possessed not only a firearm, but also a night stick and handcuffs, made it more probable that Webb possessed the firearm not for recreational purposes, but rather to facilitate various drug transactions. Moreover, the fact that the items were found in Webb's car supported the inference that he had a direct possessory interest in the items.
 
 
 34
 Second, Webb's argument that the probative value of the evidence was substantially outweighed by unfair prejudice, simply is unfounded on the facts of the case. The items introduced at trial are, unlike the evidence of child molestation in Ham, not the type of evidence that inflames a jury to convict a defendant on the basis of irrational emotions. In the instant case, unlike in Ham, supra, the items introduced were in fact related to the crimes charged, and are not the type of evidence which, on their own, would cause the jury to vote to convict. Moreover, unlike in Ham, the items introduced did not establish prior bad acts by Webb completely independent from the crimes charged.[2] Thus, there was no evidence that the district court acted arbitrarily or irrationally in admitting the beepers, nightstick and handcuffs into evidence.
 
 
 35
 Finally, even if the district court's rulings were in error, they amount to no more than harmless error. Indeed, notwithstanding the introduction into evidence of the beepers, night stick, and handcuffs, it is clear that the jury would have nevertheless convicted Webb of the crimes charged. The evidence of drug trafficking was overwhelming at trial; the evidence included the testimony of Webb's codefendant Ivery, the marked bills exchanged during the drug transaction with Drakeford, Drakeford's testimony about his undercover operation, the testimony of other members of the Governor's Raid Team as to their stopping of Webb's car, and the large amounts of cash seized by the agents from Webb's car. The admission of the items in question were therefore, even if erroneous, not more than harmless error.
 
 II. Admission of Evidence of Self-Employment
 
 36
 Webb next alleges that the district court abused its discretion in allowing Agent Henry to testify as to Webb's statement made at a pre-trial bond hearing that he was self-employed in a landscaping and yard maintenance business at the time of his arrest. In particular, Webb alleges that in allowing Henry to testify as to the statement, the district court: (1) denied him effective assistance of counsel under the Sixth Amendment because defense counsel was unable effectively to cross-examine Henry since raising the issues addressed at the bond hearing would put Webb's character at issue; and (2) that the district court therefore placed Webb in such a position that he was in effect forced to take the witness stand in his own defense, therefore violating his Fifth Amendment rights against self-incrimination.[3]
 
 
 37
 A. Sixth Amendment Assistance of Counsel Claim
 
 
 38
 The government introduced evidence that Webb, at his pre-trial hearing, claimed to be self-employed in a landscaping and yard maintenance business at the time of his arrest. In particular, the government introduced that evidence because it tended to establish that the large amount of cash, the pistol, the night stick, and handcuffs found in Webb's car were more likely related to Webb's involvement in a drug conspiracy than to any other job that Webb may claim to have had at the time of his arrest. Webb, on appeal, claims that his Sixth Amendment right to effective assistance of counsel was denied by such testimony because his counsel could not adequately crossexamine Henry regarding Webb's employment history without opening the door to the fact that Henry's testimony was ascertained from Webb's testimony at a pre-trial hearing, thus placing Webb's character at issue. Webb argues that he was thus forced to chose between a limited and ineffective cross-examination of Henry or an effective examination which would have put Webb's character into issue.
 
 
 39
 It is settled that where a trial court interferes in certain ways with the ability of counsel to make independent decisions, a defendant's right to effective assistance of counsel under the Sixth Amendment is violated. The cases establishing that proposition, however, in stark contrast to the case at bar, involved situations in which the trial court in some drastic way interfered with the ability of defense counsel to prepare the case or to cross-examine a witness. For example, United States v. Cronic, 466 U.S. 648 (1984), a Supreme Court decision cited by Webb, addressed a case in which a district court appointed as defense counsel a young lawyer with a real estate practice who had never participated in a jury trial, but allowed him only 25 days to prepare for trial, even though the government had taken over four and one-half years to investigate the case. Likewise, in Geders v. United States, 425 U.S. 80 (1976), the Supreme Court held that the petitioner had been deprived of effective assistance of counsel under the Sixth Amendment where the trial court had prevented petitioner from consulting with his counsel about anything during a 17-hour overnight recess in the trial between his direct and cross-examination. Additionally, in Brooks v. Tennessee, 406 U.S. 605 (1972), the Supreme Court found a Sixth Amendment violation where a state statute required that a defendant be the first witness in the defense's case. Most relevant, in Davis v. Alaska, 415 U.S. 308 (1974), the Supreme Court held that the petitioner was denied his Sixth Amendment confrontation rights in a case in which the trial court issued a protective order prohibiting the questioning of a key prosecution witness concerning a matter pertaining to the witness's bias and credibility.
 
 
 40
 The instant case, by stark contrast, is not one in which the trial court in any way prohibited the cross-examination of Henry by defense counsel; the district court merely allowed Henry to testify as to Webb's claims of self-employment which were voluntarily made by Webb at a pre-trial hearing. In so doing, moreover, the district court took care to protect Webb from any possible prejudice that could have spilled over from the evidence presented at the pre-trial hearing. For example, the district court instructed Henry to relate Webb's statement to the jury only in a generic sense, and to avoid any mention of the fact that Webb testified at the pre-trial hearing. Moreover, the district court explicitly instructed Webb's attorney that he could cross-examine Henry from the transcript of the pre-trial hearing, in particular advising the attorney to notify the court if Henry strayed in any way from the pre-trial hearing transcript. Moreover, the district court explicitly warned the defense attorney to be cognizant of opening the door, on cross-examination, to any questions that might put Webb's character at issue. Indeed, Henry's testimony as to the pre-trial hearing was limited only to the following observations:
 
 
 41
 During the course of the investigation, it was reported that the Defendant worked with Telenex in Philadelphia, Pennsylvania from 1989 to 1991. After which he left the Philadelphia area and moved to Atlanta, Georgia. He was selfemployed there along with his brother performing such jobs as yard work, painting, what have you.
 
 
 42
 Such testimony in no way put Webb's character at issue in such a way that cross-examination by defense counsel was effectively precluded. Indeed, it is clear from the record that Henry avoided any reference at all to the fact that his knowledge of the facts he testified about was ascertained at a pre-trial hearing. Thus, Webb's Sixth Amendment claim fails.
 
 B. Fifth Amendment Claim
 
 43
 Webb also alleges that the district court, in permitting Henry to testify as to Webb's purported self-employment as a landscaper, deprived him of his Fifth Amendment rights because in crossexamining Henry, defense counsel would have been unable to raise issues addressed at the pre-trial detention hearing without putting Webb's character in issue and thus forcing him to take the witness stand in his own defense. Without further explanation, Webb merely contends that his right against self-incrimination was violated because he was forced to choose between cross-examining Henry fully and thus bringing his character into issue, or not cross-examining Henry at all. Webb's argument that this amounts to a violation of the Fifth Amendment is not only completely unsupported by the law, but is also not even supported by specific allegations or case law in Webb's own brief to the court.
 
 
 44
 Webb's Fifth Amendment argument is wholly unavailing. Indeed, there is no case law suggesting that a defendant's Fifth Amendment rights are violated simply because effective cross-examination of a witness would necessarily put the defendant's character at issue. This is not a case in which statements made before the magistrate judge at the pre-trial detention hearing were involuntary or compelled, nor is it the type of case in which Webb was inadequately apprised of his Fifth Amendment right to remain silent at the pre-trial hearing.
 
 
 45
 Additionally, as pointed out by the government, Webb failed adequately to preserve this claim for appeal. FRE 103 states that before a claim of error from an evidentiary ruling can be raised, the nature of the evidence must be made known to the district court by virtue of a proffer or otherwise. Here, Webb did not proffer to the district court, and has not identified exactly what counsel could have asked Henry on cross-examination that would have compelled Webb to take the witness stand to defend his character. Indeed, there is nothing in the record to indicate why an effective cross-examination of Henry would have compelled Webb to testify in his own defense. It is also unclear exactly why Henry's testimony about Webb's selfemployment as a landscaper could have put Webb's character at issue.[4] For the foregoing reasons, the constitutional rights of Webb were in no way infringed by the district court's allowing Henry to testify as to statements made during Webb's detention hearing. We therefore do not find reversible error.
 
 
 46
 III. Henry's Testimony Regarding the Black Talon Bullets
 
 
 47
 Webb next alleges that the district court committed reversible error by admitting into evidence testimony about the Black Talon hollow point bullets. In particular, he contends that the prejudicial effect and cumulative nature of the testimony outweighed the probative value of the evidence. Under the familiar standard for admission of evidence under FRE 403, discussed in Section I above, it is clear that the district court did not abuse its discretion in admitting such evidence. Webb's argument is therefore unavailing.
 
 
 48
 In the instant case, the district court allowed Henry, over Webb's objection, to testify as to the lethal nature of the Black Talon hollow point bullets which were seized from Webb's car during his arrest, and which were actually loaded into the firearm found in Webb's possession in the car. In particular, Henry testified that Black Talon bullets, unlike other normal bullets used in .40 caliber pistols, are particularly deadly, and are not merely used for target shooting because they are very expensive. The decision to allow such testimony was not in error.
 
 
 49
 First, the evidence was certainly relevant to the prosecution's attempt to prove a violation of 18 U.S.C. Sec. 924(c), which requires that the government not only prove that Webb knowingly used a firearm, but that he used it "in relation to" a drug trafficking offense. See United States v. Brockington, 849 F.2d 872, 875-76 (4th Cir.1988). Indeed, courts have specifically relied upon the fact that a firearm was loaded with hollow point bullets to support an inference that the firearm facilitated a drug offense by emboldening a defendant to commit the underlying offense. See, e.g., United States v. Johnson, 12 F.3d 827, 833 (8th Cir.1994), cert. denied, 114 S.Ct. 1860 (1994) (the fact that the three weapons found were fully loaded with hollow point bullets supported the conclusion that the defendant relied upon the presence of the weapons to further his drug activities). Hence, Webb's contention that the nature of the bullets "had zero probative value," is simply unfounded.
 
 
 50
 Second, the testimony as to the lethal nature of hollow point bullets is not so unduly prejudicial as to outweigh its probative value. Indeed, the destructive force of such bullets is directly relevant to the crime charged, and thus does not amount to the type of extraneous, "prior bad act" evidence that should normally be excluded as unduly prejudicial. The bullets are not the type of evidence that would cause the jury to convict on wholly irrational bases.
 
 
 51
 Third, Webb's contention that he had no actual connection with the weapon in question to justify admission of the bullet evidence is unsupported by the facts of the case. In fact, the gun was in Webb's possession at the time his car was stopped by the Governor's Raid Team; at least two members of the Raid Team, as well as Ivery, testified that Webb's hand was on the pistol at the time of the stopping, probably in an effort to hide the pistol before the Raid Team members could reach the car. Moreover, the car was rented in Webb's name, thus establishing a direct connection between its contents and Webb.
 
 
 52
 Fourth, even if for some reason the testimony was improperly admitted, such admission did not amount to more than harmless error. The fact that the pistol was found in Webb's possession and that standard bullets were also seized from his rented car renders less pivotal Henry's testimony about the hollow point bullets. Even without the testimony in question, therefore, it is probable that Webb would still have been convicted of possessing a firearm in violation of 18 U.S.C. Sec. 924(c); there was sufficient other evidence suggesting that he carried the pistol during and in relation to a drug trafficking crime.
 
 
 53
 Moreover, such evidentiary decisions are normally left to the sound discretion of trial courts and will only be reversed if deemed to be arbitrary or irrational. In light of the direct relevance of the testimony to the crimes charged, the situation is not one justifying reversal.
 
 IV. Denial of Motion to Acquit on Count V
 
 54
 Finally, Webb contends that the district court erred in failing to grant his motion to acquit on Count V of the indictment which charged him with possessing a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. Sec. 924(c). He claims in particular that there was no evidence showing that the firearm found in the car played an integral role in the drug offense charged, and thus that he should not have been convicted of Count V. Because there was more than sufficient evidence in the record supporting Webb's conviction under Sec. 924(c), we affirm the district court's decision.
 
 
 55
 In United States v. Sloley, 19 F.3d 149 (4th Cir.1994), cert. denied, 114 S.Ct. 2757 (1994), we recently reaffirmed the highly deferential standard which an appellate court must employ in reviewing a denial of a motion for an acquittal. In Sloley, the appellant had moved, just as in the instant case, for acquittal on a firearm count under 18 U.S.C. Sec. 924(c). In finding that the district court did not err in denying the defendant's motion, we held:
 
 
 56
 In reviewing the denial of a motion for acquittal, we consider the evidence and all reasonable inferences that can be drawn from it in the light most favorable to the Government, as we determine whether any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. Rule 29 of the Federal Rules of Criminal Procedure provides that a court shall grant a defendant's motion for judgment of acquittal "if the evidence is insufficient to sustain a conviction."
 
 
 57
 19 F.3d at 152 (citations omitted). In affirming the district court's denial of the motion to acquit, we additionally articulated the elements necessary to prove a violation of Sec. 924(c):
 
 
 58
 By its terms, the statute requires the prosecution to make two showings: first, the Government must prove that the defendant "[u]sed or carrie[d] a firearm"; and second, it must prove that the use or carrying was "during and in relation to" a "drug trafficking crime." ... The Supreme Court recently interpreted Sec. 924(c)(1) and concluded that the "in relation to" language requires, at a minimum, that the use or carrying of the firearm facilitated, furthered, or had the potential to facilitate or further the drug crime.
 
 
 59
 Id. (emphasis added). Under this standard, we found that there was sufficient evidence to support a violation of Sec. 924(c) in light of the fact that the defendant in that case grabbed the revolver and thus prevented his immediate arrest. Id. In so holding, we relied expressly on our prior decision in United States v. Brockington, 849 F.2d 872 (4th Cir.1988), which held that the "in relation to" language specifically endorsed the conviction of a defendant under Sec. 924(c) where it could be inferred from circumstantial evidence that the defendant "intended to use the gun ... to make his escape." Sloley at 153, quoting Brockington, 849 F.3d at 876.
 
 
 60
 Under the standard articulated in Brockington, and reaffirmed in Sloley, it is clear that the district court did not err in denying Webb's motion to acquit on Count V of the indictment. Several considerations compel such a result.
 
 
 61
 First, the firearm in question was undeniably found in the front of the car rented by Webb in his own name. The car, moreover, was just returning from a transaction with Drakeford in which a large amount of money had been exchanged for crack cocaine. That permitted an inference that the gun was used in furtherance of the trafficking crime. Indeed, under Sloley, all that is required to prove a violation of Sec. 924(c) is that the firearm had the "potential" to facilitate or further the drug crime.
 
 
 62
 Second, various members of the Governor's Raid Team actually testified that they saw Webb's hands on the pistol as they converged upon the car. Codefendant Ivery also testified that Webb pulled the pistol from the waistband of his pants as the agents approached the car. That evidence could easily have led a rational trier of fact to connect the possession of the firearm to the just-completed drug exchange with Drakeford.
 
 
 63
 Third, the fact that Webb had the pistol in his car is itself sufficient to prove that he carried the pistol "during" a drug trafficking offense. In fact, it is clearly established that, when a motor vehicle is used to distribute drugs, as Webb did, the element requiring "carrying a weapon" is easily satisfied; the means of carrying is the vehicle itself, rather than the defendant's hands. See United States v. Ross, 920 F.2d 1530, 1536 (10th Cir.1990). Thus, even without Ivery's testimony that Webb carried the gun in his waistband, the "carrying" element of Sec. 924(c) was well supported by the evidence presented.
 
 
 64
 Fourth, contrary to Webb's suggestions, it is not necessary for the prosecution to show that the firearm was brandished, fired, or displayed during the drug transaction in order to establish a violation of Sec. 924(c). Indeed, as stated in Sloley, it is sufficient to establish the "in relation to" element by showing that the existence of the firearm could have potentially facilitated the drug transaction. See also Brockington, 849 F.2d 872 (4th Cir.1988) ("it is enough if the firearm is present for protection and to facilitate the likelihood of success, whether or not it is actually used"). It is enough to show that the defendant intended to use the gun if a contingency arose or that the firearm "emboldened" the defendant to commit the underlying offense. See United States v. Torres-Medina, 935 F.2d 1047, 1050 (9th Cir.1991) ("A firearm may play a role in the offense simply by emboldening the defendant to act; the defendant need not have drawn his weapon or fired rounds.").
 
 
 65
 From the evidence on the record, a rational trier of fact could have found that the firearm in Webb's possession was used during and in relation to a drug trafficking crime in violation of 18 U.S.C. Sec. 924(c), particularly in light of the fact that the gun was loaded at the time that the car was stopped, and that there were spare rounds of ammunition also found in the car. Thus, the district court did not err in denying Webb's motion to acquit.
 
 Accordingly, the judgment is
 
 66
 AFFIRMED.
 
 
 
 [1]
 The Appellant also filed a supplemental pro se brief setting forth three arguments: (1) that the district court erred in allowing into evidence the testimony of a co-defendant who did not provide the court with "sufficient indicia of reliability" to support her testimony; (2) that the district court violated Webb's Sixth Amendment rights under the Confrontation Clause by suppressing evidence that could impeach a government witness; and (3) that the district court incorrectly enhanced Webb's sentence. These arguments are brought for the first time on appeal, and clearly fail under the proper "plain error" standard of review. Therefore, we do not discuss these additional claims at length here
 
 
 [2]
 The Appellant's reliance on United States v. Huddleston, 802 F.2d 874 (6th Cir.1986), is for this reason, misplaced. Indeed, one of the reasons the evidence at issue in Huddleston was found inadmissible was that it sought to prove prior bad acts of the defendant, independent of the crimes charged. Here, in contrast, evidence of Webb's possession of the night stick, beepers, and handcuffs, was not introduced to prove some prior bad act by Webb other than the crimes directly at issue
 
 
 [3]
 Webb also contends that Henry's testimony had no probative value, and alternatively, was unduly prejudicial. This argument has no merit. First, Webb's employment history was relevant to the drug conspiracy charge and the possession of the firearm charge because evidence that he was self-employed as a landscaper tended to establish that the firearm, large amounts of cash and nightstick were related not to his employment, but rather to his involvement in a drug conspiracy. Second, evidence that he testified to being self-employed as a landscaper is in no way inherently prejudicial; a landscaping job has no particularly negative connotations that would unduly prejudice Webb
 
 
 [4]
 The only possible character issue was the fact that Webb misrepresented on a car rental agreement that he was employed elsewhere at the time he rented the car. However, Henry did not testify about the rental agreement, and the district court specifically instructed the prosecution not to argue to the jury that Webb was untruthful