**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-4562

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

PAUL DOUGLAS GUILD,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Senior District Judge. (1:07-cr-00404-JCC-1)

Argued: May 15, 2009                    Decided: August 25, 2009

Before Sandra Day O'CONNOR, Associate Justice (Retired), Supreme Court of the United States, sitting by designation, and NIEMEYER and GREGORY, Circuit Judges.

Affirmed by unpublished opinion. Associate Justice O'Connor wrote the opinion, in which Judge Niemeyer and Judge Gregory joined.

**ARGUED:** Joseph Michael Hannon, Jr., HANNON LAW GROUP, LLP, Washington, D.C., for Appellant. Benjamin L. Hatch, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Sarah R. Bagley, HANNON LAW GROUP, LLP, Washington, D.C., for Appellant. Chuck Rosenberg, United States Attorney, Patricia Haynes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

O'CONNOR, Associate Justice (Retired):

Defendant-appellant Paul Guild sexually assaulted two boys entrusted to his care by their respective parents on his promise that he would tutor them and arrange for their participation in music lessons and team sports. He presents a host of challenges to his conviction and sentence. We find none meritorious and consequently affirm the judgment of the district court.

I.

Guild served as a Regional Supervisory Executive Officer for the U.S. Agency for International Development ("USAID") stationed in Kiev, Ukraine. When one of his colleagues was transferred from Kiev to the United States, Guild agreed to take in her fourteen-year-old son, Nathan, so that Nathan could complete orthodontic treatments. Guild agreed to arrange for music lessons, team sports, and summer jobs for Nathan, and also to tutor Nathan in math and English. When another member of the Kiev diplomatic community learned of these planned activities, he asked if his fifteen-year-old stepson, Ousmane, could participate as well, and Guild agreed.

One night when Ousmane was sleeping over, Guild called the two boys to his room, where he was seated with a towel over his lap, otherwise naked. Guild told the boys that he had been

3

spanked as a child, made each take off his pants and underwear, and spanked them. The boys reported that they observed semen on Guild's penis. Approximately one month later, Guild brought Ousmane to Guild's home under the pretense of tutoring the boy. Guild ordered Ousmane to take a shower and entered the bathroom while the shower was in progress. Later, Guild, who was nude, approached Ousmane and told the boy he was going to teach him how to shave. To shave properly, Guild explained, one must be nude. Guild then pulled down Ousmane's boxer shorts, touched the boy's penis, hugged him, kissed him on the lips, and told Ousmane that he loved him. Ousmane described the episode to his mother, and his family ultimately contacted USAID Health Officer Marilyn Prekup to report the incident.

Prekup and two Department of State Diplomatic Security Agents—David Walsh and Ronnie Catipon—visited Ousmane's home and interviewed the boy for approximately thirty minutes. They then contacted Agent Lynn Falanga of the Office of Professional Responsibility in Washington, D.C., who instructed them to interrogate Guild. They did so later that day and determined that Guild was a danger to his wife and children. Prekup and the agents then met with the U.S. Ambassador, who issued an order of involuntary curtailment. Pursuant to that order, Agent Walsh was to implement a medical evacuation of Guild the following day. That evening, USAID Mission Director Earl Gast

4

and Agents Walsh and Catipon interviewed Guild again. Guild was informed of his Miranda rights. By mistake, he was also offered for his signature a form that purported to grant his statements use immunity. That evening, Prekup took Nathan into her home for the night.

The next morning, Agent Walsh took Guild to the airport, where they boarded a flight to Kennedy Airport in New York. Guild was not restrained. In fact, he upgraded his ticket to a first class seat, leaving Agent Walsh behind in coach. The two arrived at Kennedy with little time to get to La Guardia airport in order to catch their next flight. As a professional courtesy, local law enforcement drove the pair from Kennedy to La Guardia in an official vehicle, using flashing lights to avoid traffic delays. Walsh and Guild made their flight to Reagan Airport in Washington, D.C.

Agent Falanga met them at Reagan, told Guild that she was investigating his case, and advised him to retain an attorney. She informed him that he was not required to speak to her, but that he was required to be available by telephone at all times. Guild was then taken to a hotel, where he stayed for two days. He subsequently moved in with a friend in Takoma Park, Maryland.

Agent Falanga later met with Assistant U.S. Attorney Michael Pauze of the office of the U.S. Attorney for the District of Maryland in order to discuss Guild's prosecution.

5

Pauze reviewed the file, discovered the purported use immunity agreement, and concluded that his office and Falanga were "tainted." He instructed her to transfer the case to other agents and to explain to those agents that they should pursue the matter with the U.S. Attorney's Office for the Eastern District of Virginia. Falanga did so, advising the new investigators—including Agent Edward Allen—that they were not to communicate with recused personnel such as herself. Agent Allen later sent Falanga an email voicing his concern that there was no jurisdiction for a Virginia investigation and inquiring whether other, non-tainted Maryland personnel might pursue the matter. Pauze responded, explaining to Allen that there would be jurisdiction if Guild were arrested in Virginia.

Agent Allen then spoke with Assistant U. S. Attorney Patricia Haynes of the office of the U.S. Attorney for the Eastern District of Virginia. Haynes ostensibly knew that Guild was represented by an attorney from the American Foreign Service Association, an organization that represents foreign-service officers in employment matters. She authorized Allen to make contact with Guild in order to try to get Guild to come to Virginia. To that end, Allen called Guild and directed him to turn in his passports to Allen's office in Rosslyn, Virginia. Guild responded that he was taking his daughter to Reagan Airport in Virginia the next morning. Later that day, Allen was

6

contacted by Joseph Hannon, who informed Allen that he was representing Guild. Allen continued to demand Guild's passports. The next morning, agents arrested Guild at Reagan airport. As the investigation proceeded, Haynes and the investigating officers were in contact with Health Officer Prekup.

Guild was subsequently indicted on three counts of sexual abuse of a minor, three counts of abusive sexual contact, and two counts of misdemeanor assault. At trial, he unsuccessfully objected to Officer Prekup's involvement in the case. He also sought prosecutor Haynes's testimony on the issue of venue. Pursuant to United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951), and applicable regulations, Haynes's supervisor, Dana Boente submitted a "Touhy letter," which authorized Haynes to speak on certain topics and prohibited her from addressing others. The parties disputed the propriety and interpretation of the letter. The jury convicted Guild of two counts of assault and a count of sexual abuse related to his conduct with Ousmane. He was acquitted of his alleged abuse of Nathan.

At sentencing, the district court imposed a four-point enhancement based on Guild's supervision of Ousmane at the time he was abused. The district court also imposed a two point enhancement for obstruction of justice based in part on Guild's testimony, rejected by the jury, that he did not touch Ousmane's

7

penis. The court considered acquitted conduct in its sentencing analysis, namely, the allegations that Guild also sexually assaulted Nathan. Finally, the court denied Guild's motion for a downward departure. The court sentenced Guild to the lowest sentence in the applicable Sentencing Guidelines range, fifty-one months in prison followed by five years of supervised release.

Guild challenges his conviction and sentence. We have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. §§ 1291, and affirm.

## II.

### A. Use Immunity

When the Government grants a defendant use immunity, it "cannot use the immunized testimony or any evidence derived from it either directly or indirectly." United States v. Harris, 973 F.2d 333, 336 (4th Cir. 1992) (discussing Kastigar v. United States, 406 U.S. 441 (1972)). "This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." Kastigar, 406 U.S. at 460 (footnote omitted). But use immunity "only protects against the government's use of compulsory testimony as a source of

8

evidence, leaving the government free to use any other evidence to prosecute." Harris, 973 F.2d, at 336. Thus, the Government can prosecute a previously use-immunized defendant if it can "demonstrate that all its evidence came from sources independent of the compelled testimony." Id.

Guild moved to dismiss his indictment, arguing that the Government's case was impermissibly derived from the testimony it secured from him under the grant of use immunity. The district court held a "Kastigar hearing" and concluded that the Government met its burden of demonstrating that Guild's prosecution was not tainted by that evidence. In a thorough analysis, the court stressed that Ousmane "was initially interviewed before [Guild] made his statement, and [Ousmane's] statement [was] what prompted the investigation." J.A. 953. After the taint was discovered, the court found, "[t]he new agents and prosecutors had no knowledge of the contents of the immunized interview, which was never available to them." Id. And "[t]he Government's primary trial witnesses were the two victims, . . . their mothers, and [Ousmane]'s stepfather, all of whom testified that they had no knowledge as to the contents of the immunized statement." Id. at 954.

Guild challenges these factual findings. We review the "findings on the independent nature of the allegedly untainted evidence" for clear error, Harris, 973 F.2d at 337, and reject

9

his challenge. Guild's factual arguments fall into three general categories. First, he argues that "Haynes was fortified in her pursuit of this case by her knowledge that Mr. Guild gave a statement consistent with that of Ousmane" and by Officer Falanga's comment to her that the case was "a 'strong one.'" (Appellant's Br. 23.) But the district court saw matters differently. It found that Haynes's prosecution was shaped by the victims' statements, not by oblique references to the existence of Guild's immunized interview. And after hearing testimony on this issue, the district court concluded that Officer Falanga's communications with Haynes "in no way shape[d] the investigation or illuminate[d] the specific contents of the [immunized] statement." (J.A. 953.) We see no reason to disturb the court's well-supported conclusions.

Second, in light of "her knowledge of Mr. Guild's statements," Guild argues, "Prekup should not have been allowed to contribute to the Government's prosecution or presentation at trial" (Appellant's Br. 26.) The district court made contrary factual findings. It explained that Prekup's "knowledge of the [immunized] statement was very vague and limited, came the day after that statement was given, . . . and was not refreshed in any manner." (J.A. 954-55.) And "[h]er testimony at trial was limited to questions of fact." (Id. at 955.) Lastly, the State-side investigators and prosecutors shaped Guild's

10

prosecution on the basis of his victims' statements, not on any insights as to Guild's interview they may have inadvertently gleaned from Prekup. We perceive no error in these factual conclusions.

Third, Guild contends that his victims' testimony was tainted by his statements. "Ousmane, Nathan, their mothers and Ousmane's stepfather did not have direct knowledge of" his statements, Guild concedes. (Appellant's Br. 24.) But he argues that the victims were interviewed by people "with direct (Prekup) or indirect (Haynes) knowledge of the statement" and that "the teenagers were influenced by these adults." (Id. at 25.) We have already rejected Guild's argument that Haynes was influenced by tangential commentary pertaining to Guild's immunized statements. As to Prekup, the district court found that while she did participate in one interview of Ousmane, "there [was] no indication that she was there as anything other than a medical support, nor that she participated in the substantive questioning in any way that could [have] shape[d] his testimony." (J.A. 955.) And while "she spoke with [Ousmane]'s stepfather by phone on several occasions," she "did not tell him of [Guild's] statement." (Id.) In short, Prekup's "knowledge of [the immunized interview] was not conveyed to other witnesses or investigators to shape the investigation or

11

other evidence." (Id.) Guild has offered no basis to undermine that finding.

In sum, Guild has fallen far short of demonstrating clear error. He presents his conclusory view of the facts, but offers us no reason to ignore the district court's contrary findings.

B. Unethical Communication with Guild

Guild contends that his indictment should have been dismissed because he was represented by counsel when Agent Allen called him directly to request that he turn in his passport to Allen's Rosslyn, Virginia, office. More specifically, he argues that (i) the district court's conclusion that no ethical violation occurred was erroneous and (ii) dismissal of his indictment was the proper remedy for this purported ethical violation. The district court thoroughly considered the overlapping federal and state authorities governing the inquiry whether an ethical violation occurred. And it made detailed factual findings when applying those authorities. No error is readily apparent in its careful analysis.

We do not affirm the court's judgment on this basis, though, because dismissal of Guild's indictment would in any event have been an unwarranted remedy. We need look no further than the Supreme Court's unanimous opinion in United States v. Morrison, 449 U.S. 361 (1981), to illustrate the point. In Morrison, "two agents of the Drug Enforcement Agency, aware that

12

[Morrison] had been indicted and had retained counsel, sought to obtain her cooperation in a related investigation." Id. at 362. During their meeting, the agents "disparaged [her] counsel," suggested that "she could be better represented by the public defender," told her "that [she] would gain various benefits if she cooperated but would face a stiff jail term if she did not," and subsequently "visited [her] again in the absence of counsel." Id. The Third Circuit dismissed Morrison's indictment with prejudice, reasoning that the blatant violation of Morrison's Sixth Amendment right to counsel was alone a sufficient ground for dismissal.

The Supreme Court reversed. "[R]ecogniz[ing] the necessity for preserving society's interest in the administration of criminal justice," id. at 667, the Court explained that the "extraordinary relief" of dismissal is not "appropriate in the absence of some adverse consequence to the representation [the defendant] received or to the fairness of the proceedings leading to [his] conviction," id. at 363-64. "[A]bsent demonstrable prejudice," the Court held, "dismissal of [an] indictment is plainly inappropriate, even though the violation may have been deliberate." Id. at 365. It found no such prejudice. The Court found compelling that Morrison, like Guild, "declined to cooperate and immediately notified her attorney" and that "at no time did [she] agree to cooperate with

13

them, incriminate herself, or supply any information pertinent to her case." Id. at 362-63. Instead, "[c]ontrary to the agents' advice, [she] continued to rely upon the services of the attorney whom she had retained." Id. at 363.

Guild's case falls short of Morrison's. The law enforcement conduct he alleges is less egregious and the ethical violation he postulates is less significant than the Sixth Amendment right at issue in the Morrison case. At worst, the law enforcement agent "intended to lure Mr. Guild into Virginia," (Appellant's Br. 13), without success. Guild did not travel to Virginia to surrender his passports to Agent Allen, as was the plan. This purported scheme was advanced pre-indictment, in an effort to make a lawful arrest in a chosen jurisdiction, not to interfere in any way with Guild's ability to defend himself. After the single, brief phone conversation at issue, Guild, like Morrison, immediately spoke with his lawyer, who interposed himself between Guild and the law enforcement agent well before Guild travelled to Virginia. As in Morrison, Guild's brief "contain[s] no allegation that" the claimed ethical violation "prejudiced the quality or effectiveness of [his] legal representation," nor does he credibly "assert that the behavior of the agents . . . resulted in the prosecution having a stronger case against [him], or had any other adverse impact on [his] legal position." Morrison,

14

449 U.S., at 363.  Instead, his argument is "based solely upon the [purportedly] egregious behavior of the agents, which [he] describe[s] as having interfered in some unspecified way" with his defense.  Id. (internal quotation marks omitted).  Dismissal of the indictment is thus inappropriate.  As dismissal is the only remedy Guild sought below, and the only remedy he seeks before us, we need discuss his argument no further.

In an effort to bolster his quest for the dismissal of his indictment, Guild makes repeated reference to a "litany of discovery violations committed by the prosecution." (Appellant's Br. 36; see, e.g., id. at 35 (referring to a "continuing pattern of misconduct by the investigators and prosecutor in this case"); id. at 34 ("Throughout the investigation and prosecution the Government skirted ethical rules and violated constitutional principles[.]").)  He postulates that various of his constitutional rights were violated as a result of the Government's "shocking and egregious" conduct during the course of discovery.  (Id. at 35.) The district court is to be commended for its careful treatment of each of these allegations and for its balanced conclusion. "Although . . . it may have been possible for the Government to have provided some [discovery] information more quickly than it did," the court explained, Guild "produced no evidence that the Government acted in bad faith or that its provision [of

15

evidence] was outside the time frame established by law or by [the] Court." (J.A. 945.) We have no reason to doubt the district court's findings. Again, we nonetheless affirm its judgment on the simpler basis that Guild has failed entirely to demonstrate that dismissal would be an appropriate remedy.

## B. Venue

A defendant charged with a crime committed "out of the jurisdiction of any particular State or district" must be brought to trial in "the district in which the offender . . . is arrested or is first brought." 18 U.S.C. § 3238. On appeal, we ask "whether any rational trier of fact" could have concluded that the Government met its burden of establishing venue, "constru[ing] the evidence in the light most favorable to the government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, both direct and circumstantial." United States v. Burns, 990 F.2d 1426, 1431 (4th Cir. 1993).

The district court three times rejected Guild's challenge to the venue of his trial. Because he was arrested in Virginia, we find no fault in its decisions. Guild's challenge to the propriety of the venue for his trial derives from his fundamental misunderstanding of the governing statute. He concedes that "the Government arrested [him] in the Eastern

16

District of Virginia" but vigorously argues that "he was 'first brought' to New York." (Appellant's Br. 43; see, e.g., id. at 42 (arguing that "even an incidental stop in the United States, regardless of whether it is the intended destination of the flight returning the defendant from overseas, triggers the 'first brought' option" (some internal quotation marks omitted)).) The statute is disjunctive—it provides for venue where a defendant "is arrested or is first brought." 18 U.S.C. § 3238 (emphasis added). Because Guild was arrested in Virginia, venue was proper there under the arrest "option," (Appellant's Br. 42) whether or not he was "first brought" to New York. We thus need not address Guild's arguments as to the construction and application of the phrase "first brought." For our purposes, it is sufficient that he was arrested where he was tried, as he concedes. (See J.A. 106) ("There is no dispute that Defendant was arrested in the Eastern District of Virginia."). Guild's challenge to the jury instruction on venue is similarly premised on his erroneous reading of the statute, and we reject it for that reason.

## C. Right to Present a Defense

Guild argues that his "constitutional right to present a defense was repeatedly violated by actions of the government and the district court." (Appellant's Br. 46.) Specifically, he

17

contends that (i) the Government "interposed unauthorized and baseless Touhy objections to [his] effort to examine . . . Haynes," and (ii) the District Court "compromised the trial by repeatedly intruding on defense counsel's examination of witnesses and admonishing defense counsel to hurry along its case." (Id.) We reject both of these contentions.

In United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951), the Supreme Court upheld "a refusal by a subordinate of the Department of Justice to" testify in response to a subpoena "on the ground that the subordinate [was] prohibited from making such submission by his superior through" Department of Justice regulations. Id. at 467. Since Touhy, the Department of Justice has routinely "promulgate[d] so-called Touhy regulations to govern the conditions and procedures by which [its] employees may testify about work-related issues at trial." United States v. Soriano-Jarquin, 492 F.3d 495, 504 (4th Cir. 2007). Pursuant to these regulations, an applicant makes a formal request for testimony or for the production of documents and the Department of Justice provides a response. The regulations do not "purport to grant any right of access to applicants . . . and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States." Smith v. Cromer, 159 F.3d 875, 880 (4th Cir. 1998). Thus, a failure to disclose information under Touhy only

18

violates the defendant's Sixth Amendment rights to present a defense where the defendant can show that the excluded testimony "would have been both material and favorable to his defense." United States v. Valenzuela-Bernal, 458 U.S. 858 (1982). In order to overcome the exclusion of evidence pursuant to a claimed Touhy privilege, a defendant must demonstrate his need for that evidence, and "the showing of necessity which is made will determine how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate." United States v. Reynolds, 345 U.S. 1, 11 (1953).

Guild sought to have Haynes testify as to the issue of venue. Haynes's supervisor, Boente authorized Haynes to speak on certain topics but did not allow testimony she deemed to be covered by the deliberative process privilege or that disclosed inadmissible plea discussions. Boente memorialized these restrictions in a so-called "Touhy letter," upon which the district court and the parties relied. At trial, the Government made ten objections on the basis of the Touhy letter, and the district court sustained four of those objections. Guild challenged only one of those four rulings. Specifically, Guild objected to Haynes's refusal to answer the question: "Would you tell the Court what discussions you had with Agent Allen and Agent Griffin about how to arrest Mr. Guild in Virginia?" Without making any reference to this question—or any other

19

specific invocation of the Touhy privilege—Guild now argues that the Government's Touhy objections unconstitutionally undermined his right to present a defense. We disagree.

Guild has failed to establish that Haynes's response to the single question at issue during the trial would have been material or favorable to his case. The law enforcement discussions about the plans to arrest Guild in Virginia were wholly peripheral to the matter of his guilt. See Soriano-Jarquin, 492 F.3d at 504. Moreover, Guild has failed to establish his need for the testimony. Other witnesses, such as Agent Allen, had already testified in detail about those discussions. Guild has not explained why Haynes's answer would have shed additional light on his tangential line of questioning or why the description of the law enforcement discussions would have gained greater significance if uttered by Haynes. Guild has not developed a coherent argument as to any of the other invocations of the Touhy privilege at trial, and we will thus not address them.

Guild next argues that "[a] fair reading of the transcript" demonstrates that the district court deprived him of his right to present his defense by "frequently interrupt[ing] counsel, tak[ing] over questioning, and object[ing] sua sponte to counsel's examination." (Appellant's Br. 49.) He contends that his "trial [was] rife with these incidents," (id. at 50) and he

presents a string of dramatic allegations, each paired with a list of record citations without elaboration. For example, Guild argues that the district court "constantly admonish[ed] the defense to hurry along the proceedings, despite the fact that [he] moved through the presentation of his 25 witnesses in three days, relative to the government's presentation of 12 witnesses over five days." (Id.) An examination of the record reveals that Guild presented his case at his own pace. Indeed, Guild's counsel remarked that he was "ahead of [his] schedule" and ended several examinations early. (J.A. 2736; see also J.A. 2720.) The remainder of Guild's examples similarly fail to stand up to scrutiny. Our review of the record of proceedings assures us that the district court acted well within its discretion, working diligently to keep on track a trial threatened by frequent diversions and unhelpful tactics. Certainly, none of the court's actions to that end compromised Guild's constitutional rights.

## D. Sentencing Issues

When considering a challenge to a sentence, we first "examine whether the district court committed a significant procedural error" in calculating the advisory sentencing range under the U.S. Sentencing Guidelines. United States v. Curry, 523 F.3d 436, 439 (4th Cir. 2008) (internal quotation marks and

citations omitted). If no such error was committed, we "can only vacate [the] sentence if it was substantively unreasonable in light of all relevant facts." Id. See generally Gall v. United States, 552 U.S. 38 (2007). Guild argues that the district court erred by imposing both of the sentencing enhancements used to calculate his Guidelines range—one for obstruction of justice, the other based on his supervisory relationship to the victim. He also argues that the district court abused its discretion when it elected not to grant him a downward departure. These arguments lack merit.

The supervisory relationship enhancement was properly applied. The Sentencing Guidelines mandate a four-level sentence enhancement for Guild's crime if Ousmane "was in [Guild's] custody, care, or supervisory control." U.S.S.G. § 2A3.2(b)(1). This enhancement "is intended to have broad application and is to be applied whenever the victim is entrusted to the defendant, whether temporarily or permanently." Id. n.2(a). "For example, teachers, day care providers, baby-sitters, or other temporary caretakers are among those who would be subject to th[e] enhancement." Id. There can be no doubt that Ousmane was entrusted to Guild; Ousmane was in Guild's custody, care, and supervisory control. The enhancement was thus properly applied.

22

Guild argues that the enhancement is inapplicable because he "was not a teacher, day care provider, baby-sitter or temporary caretaker for Ousmane as required." (Appellant's Br. 54.) This argument also lacks merit. The positions listed in the application note do not embody an exhaustive list; the list is provided "[f]or example" and it includes relationships "among those [that] would be subject to th[e] enhancement." U.S.S.G. § 2A3.2(b)(1) n.2(a). It is meant to illustrate relationships of custody, care, or supervisory control, not to exempt any relationship that is not included in the short list. Guild's untenable construction of the sentencing enhancement suffers an additional flaw: Even his version of the enhancement would apply in the instant case because Guild served as Ousmane's teacher. It was Guild's plan to tutor Nathan in math and English that led Ousmane's stepfather to entrust Ousmane to Guild. And it was the pretense of academic instruction that repeatedly justified Guild's assumption of Ousmane's custody. Guild protests, insisting that Ousmane was not his student, but was merely "being provided work papers on occasion." (Appellant's Br. 54.) This assertion ignores the record.

The obstruction of justice enhancement was also properly applied. The Guidelines provide for a sentence enhancement if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect

23

to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. This enhancement applies if "the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." Id. Critical for our purposes, obstructive conduct includes "committing, suborning, or attempting to suborn perjury." Id. n.4(b); see United States v. Dunnigan, 507 U.S. 87 (1993). "An obstruction of justice enhancement based on perjured trial testimony is proper when the defendant . . . (1) gave false testimony; (2) concerning a material matter; (3) with the willful intent to deceive (rather than as a result of confusion, mistake or faulty memory)." United States v. Hammoud, 381 F.3d 316, 357 (4th Cir. 2004) (internal quotation marks and citation omitted).

Here, the district court found that Guild several times committed willful perjury as to material facts. For example, the court concluded that Guild "testified falsely that he never touched the penis of [Ousmane] and in his continu[ous] denial[s] that he was guilty of sexual assault." (J.A. 1172.) Similarly, Guild willfully perjured himself, the court concluded, when he testified "that he had permission from [Ousmane]'s mother to spank her son." (Id.) The court also found that Guild committed perjury by "consistently assert[ing] that he considered himself to have behaved in the boys' best interests

24

at all times, in the role of a father figure." (Id. at 1171.) In the court's view, the record established that "[Guild]'s motives were other than fatherly." (Id.) Lastly, the court found that Guild committed perjury by denying that he (i) described to Nathan sexual encounters Guild experienced at Nathan's age and (ii) encouraged Nathan to be sexually active. (Id. at 1172.)

Guild ignores all but the last instance of perjury relied upon by the district court. He challenges only the finding that he committed perjury when he denied encouraging Nathan to be sexually active. In Guild's view, this finding was legally and factually erroneous. It was legally erroneous, Guild contends, because the district court considered "acquitted conduct." The jury acquitted Guild of the charges pertaining to Nathan and thus, Guild's argument goes, the district court should not have considered the conduct underlying those charges. The Supreme Court has rejected this contention. United States v. Watts, 519 U.S. 148 (1997); see also United States v. Martinez, 136 F.3d 972, 979 (4th Cir. 1998) (a sentencing court may enhance a defendant's sentence based on its findings of conduct by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct). Rejection of the argument makes good sense. The jury must find each element of guilt beyond a reasonable doubt. But the sentencing court must consider only

25

whether the preponderance of the evidence establishes the facts pertinent to the calculation of the advisory Sentencing Guidelines range. United States v. Benkahla, 530 F.3d 300, 312 (4th Cir. 2007). The Government's failure to meet the greater burden of proof does not foreclose its opportunity to meet the lesser. Here, the district court did not err by giving the Government such an opportunity.

Nor were the court's factual findings clearly erroneous. Arguing to the contrary, Guild posits that his acquittal of the charges pertaining to Nathan "sugges[ts] that the jury found Nathan lacked in credibility and that Mr. Guild testified credibly." (Appellant's Br. 55.) By implication the district court was in Guild's view obliged to endorse this suggestion. The jury's verdict does not necessarily suggest that Nathan's testimony was not credible. Rather, it reflects the jury's inability to find Guild's guilt beyond a reasonable doubt. Moreover, as we have explained, the court was not bound by the jury's conclusions as to Nathan's credibility. The court was obliged to make its own findings by a preponderance of the evidence. It did just that. (E.g., J.A. 1171 ("[C]onsidering the demeanor, manner, and tone of the testimony, [Nathan] is a credible witness and his testimony on this issue is believable. For that reason, the Court finds by a preponderance of the

26

evidence that Defendant gave false testimony.").) The court's conclusion was not clearly erroneous.

Before us, Guild does not contest the district court's conclusions that he lied by: (1) denying that he touched Ousmane's penis; (2) claiming that he had permission to spank Ousmane; or (3) testifying that at all times he acted in the best interests of the boys, as a father would. It is difficult to understand Guild's implicit argument that notwithstanding these instances of willful, material perjury the sentence enhancement was erroneously applied. We find no merit in that argument.

Finally, we reject Guild's argument that the district court abused its discretion by declining to grant him a downward departure from the advisory Guidelines range. After properly calculating the range, 51–63 months' imprisonment, the court carefully considered the sentencing factors set forth at 18 U.S.C. § 3553(a), as it was obliged to do. See United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005). The court stressed the seriousness of the offense: "Sexual abuse has a significant and long-term impact on the victim and the victim's family." (J.A. 1175.) The harm was exacerbated in this case "by the Defendant's presentation of himself as a father-figure who could be trusted as a role-model for and caretaker of children, trust that he then betrayed by abusing children in his care." (Id.)

27

The court also considered Guild's successful employment history, his philanthropy, and his good reputation in the international community. While Guild was praised for "act[ing] as a surrogate parent for other troubled teenagers," the court noted, "the very characteristic for which [he was] lauded—opening his home to children—was the setting that allowed him to perpetrate [his] crimes." (Id. at 1176.) "[T]he egregiousness of betraying children's trust by sexually abusing them le[d] the Court to conclude that a sentence within the Guideline Range [was] appropriate." (Id. at 1178.) "[G]iven Guild[]'s history of service and charity," however, the district court declined to impose "a sentence at the very top or above the Guideline Range," which was the sentence urged by the Government. (Id. at 1178.) Instead, the court imposed the minimum Guidelines sentence of 51 months. This minimum sentence, the court reasoned, "reflect[ed] the seriousness of the offense, promote[d] respect for law, and provide[d] just punishment for the offense." (Id.)

We perceive no error in the court's consideration of the sentencing factors, and we find its sentence not only reasonable, but also generous. Guild's argument to the contrary is meritless. Guild asks us to accord greater weight to mitigating factors that were considered by the district court and cited in its decision to sentence Guild to the bottom of the

28

range.  He also argues that "[t]he outcome of the trial is more a deterrent than is [his] sentence."  (Appellant's Br. 57.) Guild fails entirely to demonstrate that his 51 month sentence— the bottom of the applicable Guidelines range—was substantively unreasonable.

* * * * *

Numerous additional arguments are suggested throughout Guild's brief.  Some take the form of thematic emphasis.  Others can be derived from case citations that appear irrelevant in context.  Few are stated in full.  To the extent we have not heretofore rejected these arguments as meritless, we do so now.

III.

For the foregoing reasons, Guild's conviction and sentence are hereby

AFFIRMED.